Filed 3/22/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080018 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1801370) |
| LATRAVIUS BRIAN GOBERT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Jacqueline Jackson, Judge. Affirmed.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Kristen Kinnaird Chenelia, Deputy Attorneys General for Plaintiff and Respondent.

Latravius Brian Gobert strangled his girlfriend, Mariah M., to death in front of their six-year-old daughter. After a jury convicted him of second degree murder, the court imposed a 35 years-to-life prison sentence.

On appeal, Gobert contends his conviction should be reversed because the trial court erroneously allowed hearsay evidence of two prior domestic violence incidents. He also seeks independent review of the materials considered by the trial court during a *Pitchess*[1] hearing. We affirm the judgment, determining that although the hearsay was inadmissible, it was harmless error. On the *Pitchess* claim, although the trial court did not follow the correct procedure at the in camera hearing, we have independently reviewed the materials and conclude there was no resulting prejudice to Gobert.

Gobert additionally contends that the portion of the minute order from the sentencing hearing prohibiting him from owning, possessing, and controlling deadly weapons and related paraphernalia should be stricken because it was not part of the oral pronouncement of judgment. The Attorney General concedes that the discrepancy requires us to strike the terms "deadly weapon" and "related paraphernalia" from the minute order, and we agree. At the same time, we reject Gobert's related contention that a notation in the minute order memorializing the court's instruction that he not possess any firearms and ammunition constitutes an unauthorized sentence.

FACTUAL AND PROCEDURAL BACKGROUND

Gobert and Mariah began dating in about 2010. A few years later they began living together when their daughter, identified at trial as Jane Doe, was born.

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

The relationship was stormy. Mariah worked nights as a stripper and after hours entertained clients she met at the club. As problems with money, work, alcohol abuse, and family life increased over the ensuing years, their arguments became progressively worse, or as Gobert's mother, Teri, put it, "[A] revolving door."

One early afternoon in March 2018, Gobert and Mariah were arguing in their apartment. Mariah told him to "pack [his] stuff and leave." Jane, who was in her bedroom, came out when her dog starting barking at the commotion. She saw her mother "on the ground naked," her body "flopping around" while Gobert's was strangling her.

Gobert left Mariah's lifeless body in the bathroom, and instead of calling paramedics drove with Jane to his mother's house, just a few minutes away. After he went upstairs to speak to Teri, Jane heard her scream.

Gobert and Teri quickly drove back to his apartment. It had been about 25 minutes since Mariah was strangled. Teri found her dead in the bathroom. An autopsy showed that cartilage in Mariah's neck was fractured, and petechial hemorrhaging was present around her eyes, cheeks, forehead, and lips—telltale signs of strangulation. According to the pathologist, death by strangulation takes time—about four to five minutes.

Police interrogated Gobert the same night.[2] Initially, he claimed that Mariah slipped in the bathroom. But later he described being frustrated with Mariah's "drinking and partying" while he stayed at home. Gobert explained that Mariah told him to move out and was throwing things at him. He

---

[2]    The jury watched a video of the interview.

admitted grabbing her neck and strangling her until she was "gasping" and "started coughing up something."[3]

At trial, defense counsel conceded that Gobert killed Mariah, but urged the jury to conclude it was voluntary manslaughter, the result of "passion rather than judgment." Apparently accepting that Gobert was subjectively provoked, the jury acquitted him of first degree murder, instead convicting him of murder in the second degree.

## DISCUSSION

A.  *The Trial Court Erroneously Allowed Hearsay Evidence of Prior Domestic Violence Incidents, But the Errors Were Not Prejudicial*

1.  *Smothering with a pillow*

Generally, evidence of propensity or disposition is inadmissible to prove a person's conduct on a specific occasion. (Evid. Code,[4] § 1101, subd. (a).) There is, however, a statutory exception where domestic violence is involved. "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [s]ection 1101 . . . ." (§ 1109, subd. (a)(1).) This exception applies even where, as here, the offense charged is murder. (See *People v. Mitchell* (2020) 46 Cal.App.5th 919, 929 ["courts have unambiguously rejected the suggestion that [§ 1109] may only be applied when a domestic violence offense is charged"]; *People v. Brown* (2011) 192 Cal.App.4th 1222, 1234–1237 [§ 1109 applied where defendant charged with murder].)

---

3    According to the pathologist, that type of gasping, called agonal breathing, indicates Mariah had "passed the point of no return."

4    Undesignated statutory references are to the Evidence Code.

Before trial, the prosecutor moved to admit testimony from Mariah's friend and coworker, D.S., that about a month before she was killed, Mariah told her Gobert smothered her with a pillow until she lost consciousness and awoke to being slapped by him. Defense counsel objected, asserting the evidence was inadmissible hearsay and "we don't know the specific hearsay exception" the prosecutor "is even trying to offer for admission." Without asking the prosecutor to identify the applicable hearsay exception, the trial court overruled the constitutional objections, said nothing about the hearsay objection, and stated the evidence was admissible.

When at trial the prosecutor asked D.S. about "a pillow incident," defense counsel again objected stating, "I'm going to object and ask for a standing objection that this is hearsay." The court replied, "Okay. So the objection is overruled, but the standing objection will continue *under* [*section*] *1109*."[5] (Italics added.) D.S. then testified:

> "That they were fighting and, like I said, at one point or another throughout the tussle, they fell on the floor. They were tussling on the floor, and he got—smothered her with the pillow."

On appeal, Gobert contends and the Attorney General appropriately concedes that the trial court erroneously overruled the hearsay objection. Section 1109, subdivision (a)(1) is not a hearsay exception. Nor does it independently authorize the admission of hearsay. (See generally, *People v. Quintanilla* (2020) 45 Cal.App.5th 1039, 1058–1059 [noting that the Legislature did not create an exception to the hearsay rule for domestic violence cases where the defendant kills the declarant].) Rather, it permits

_____

[5] From this comment, it appears the trial court mistakenly believed that section 1109 creates a hearsay exception. It does not.

the admission of prior domestic violence evidence notwithstanding section 1101, which otherwise excludes character evidence when offered to prove a person's conduct on a specified occasion.

2. *Moving out*

About a month before she was killed, Mariah left her Southern California home and stayed with her sister, R.J., in Las Vegas after having an argument with Gobert. She returned, fearful for her safety, about two weeks later. In a pretrial motion and over defense counsel's hearsay objection, the court stated it would allow this evidence to be admitted under section 1109.

During trial but before this testimony was presented, the prosecutor disclaimed any desire to elicit "any specific facts" about the argument, stating "I don't think there's a hearsay exception for that." Counsel explained that he only wanted "to offer a little bit of information as to why" R.J. "would drive four hours on a Saturday to go pick up her sister, bring her back to Las Vegas and have her stay out there." He maintained, "I'm not offering it for the truth of the matter, just the effect on [R.J.] and what she did subsequent."

After some further discussion the following colloquy occurred:

> "[Prosecutor:] I will just ask, you know, ['][T]hey had an argument and then she called you, said she wanted a ride to get out of town[?'] Is that [okay]?
>
> "[Defense counsel:] That's perfect.[6]
>
> "[The court:] Okay.

---

[6] In context, we understand counsel's comment, "[t]hat's perfect," and a moment later, "[o]kay," as an attempt to make the best of a bad situation, mitigating the prejudicial effect of the court's pretrial ruling allowing this evidence. The Attorney General's brief does not contend otherwise.

"[Prosecutor:]  We will do it that way so there's no hearsay and doesn't violate any kind of order.

"[Defense counsel:]  Okay.

"[Prosecutor:]  *And it still allows me to get the* [*section*] *1109 in that the court has allowed me to.*

"[The Court:]  Okay.  So the objection is overruled but with the limitation that any details of the incident that may have been reported to [R.J.] would be hearsay and not admissible, and it appears the parties have agreed to at least a brief leading question . . . ."  (Italics added.)

Consistent with this discussion, R.J. testified that Mariah told her that she and Gobert "had gotten into an argument."  R.J. further testified that Mariah was "scared" and "felt that maybe it would be unsafe" for her to get her belongings from the apartment while Gobert was there.

On appeal, Gobert contends that the court erroneously overruled the hearsay objections to Mariah's out-of-court statements to R.J.  We agree. The prosecutor's theory of admissibility was twofold.  The first was that the evidence was admissible under section 1109 to show Gobert's propensity for domestic violence.  On that theory, the evidence was relevant only if offered for the truth of the matter asserted—that is, Gobert abused Mariah in the recent past and she feared future domestic violence.  Absent any applicable hearsay exception (and the Attorney General does not claim there is any), the evidence was inadmissible, notwithstanding the character evidence exception in section 1109.

The prosecutor also sought to admit Mariah's statements to R.J. for the nonhearsay purpose of explaining *R.J.'s conduct*—so the jury would understand why R.J. picked up Mariah and had her stay in Las Vegas for two weeks.  This is a nonhearsay use of the evidence.  (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1162 [" ' "The statement is not hearsay, since it is the

7

hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement." ' "].) But that does not necessarily make it admissible. "No evidence is admissible except relevant evidence." (§ 350.) For Mariah's statements to her sister to be admissible for this nonhearsay purpose, R.J.'s motive, state of mind or intent, must be independently relevant without regard to the truthfulness of those statements.

*People v. McKinnon* (2011) 52 Cal.4th 610 illustrates a paradigmatic application of this principle. There, two witnesses at a murder trial testified they heard rumors that a person who died a year before the murder was a member of the defendant's gang who had been killed by the victim's gang. The evidence was admissible for the nonhearsay purpose of showing that the defendant had also heard the rumors, believed what he had heard, and thus had a reason to kill the victim in retaliation for the prior killing. (*Id.* at p. 656.) The evidence was relevant, regardless of whether it was true, because it shed light on the defendant's motive.

The fundamental problem here is that R.J.'s motive or intent is not at issue. Therefore, evidence that she rescued Mariah from Gobert's past acts of domestic violence is only relevant to show Gobert's propensity to commit future acts *if* the past abuse occurred—that is, only if the declarant's statements are *true*. Because the use of this evidence to show propensity under section 1109 was inadmissible hearsay, and any nonhearsay use of the evidence was not relevant, the trial court erred in allowing it.

We turn now to whether the evidence was prejudicial. The parties disagree on the appropriate standard. Gobert contends *Chapman*[7] (harmless beyond a reasonable doubt) applies "because the effect of the trial court's

---

[7]     *Chapman v. California* (1967) 386 U.S. 18.

error was so egregious that the admission of the evidence violated [his] right to due process" under the federal constitution. The Attorney General maintains *Watson* is the correct standard because " 'generally, violations of state evidentiary rules do not rise to the level of federal constitutional error.' "

The Attorney General is correct. "Error in admitting evidence of a defendant's prior acts of domestic violence under section[ ] 1109 . . . is subject to the standard of prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818." (*People v. Megown* (2018) 28 Cal.App.5th 157, 167.) "Under the *Watson* test, the trial court's judgment may be overturned on appeal only if the defendant shows 'it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.' " (*Megown*, at p. 167.)

Here, the errors were not prejudicial. During his police interrogation, Gobert admitted strangling Mariah. Jane, who was nine years old when she testified, saw his hand(s) on her neck and her mother's naked body "flopping" on the floor. Against this backdrop, the propensity evidence added very little. Without that evidence, it was abundantly clear that Gobert killed Mariah. Even defense counsel in closing argument had to concede the killing was unlawful. The best the evidence allowed her to urge was voluntary manslaughter instead of murder.

Moreover, in closing argument the prosecutor did not emphasize the erroneously admitted testimony. Indeed, he underplayed it, mentioning the pillow smothering just once—and even then, obliquely. Avoiding incendiary words like "smother," he merely stated, "We know that he's grabbed her before during arguments, and we got confirmation of that. . . . [R.J.] told us about instances, and Ms. [D.S.] told us about instances." (See *People v. Lopez*

(2013) 56 Cal.4th 1028, 1064–1065 [harmless error in part because the challenged testimony was brief and the prosecutor did not emphasize it in closing argument], abrogated in part on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1191, 1216.)  Additionally, defense counsel deftly deflected the evidence, stating in closing argument, "[I]t actually supports a manslaughter conviction, shows that Mr. Gobert could be provoked but certainly had no intention of killing Mariah."  In light of these factors, there is no reasonable possibility that if D.S.'s statements were omitted the result of the trial would have been different.

Gobert, however, contends the evidence was prejudicial because there was substantial evidence that Mariah's death was "the culmination of many, many weeks of escalating provocation."  Teri described Mariah as a "hothead," who wanted everything her way.  In the moments leading up to the strangulation, Gobert told police that Mariah was hitting him saying, "I fucking hate you," and was throwing "stuff" at him.  Gobert claims that because the "only evidence" suggesting he acted with malice was the inadmissible hearsay, the error must be deemed to have been prejudicial.

This argument is undercut by the record.  The inadmissible hearsay was not the "only" evidence negating malice.  According to the medical expert, a person being strangled will lose consciousness after about a minute but not experience irreversible brain damage and imminent death until "the four-to-five minute mark."  As the prosecutor succinctly stated in closing argument, "[I]t was willful because he took his hand to her throat and squeezed until she went unconscious and eventually died.  [¶] . . . He could have let go after 30 seconds.  He could have let go after one minute. . . .  [B]ut he didn't.  He kept squeezing her neck. . . .  She fought back, she went unconscious, she stopped moving, she gasped for air, but he kept squeezing."

10

Moreover, although there was ample evidence of *subjective* provocation (which the jury apparently credited by convicting on second degree murder), evidence of objectively adequate provocation that is necessary to reduce murder to voluntary manslaughter was extremely thin. Viewing the evidence in the light most favorable to Gobert, Mariah's provocative conduct consisted of sharp words and simple assault that cause no physical injury. Even assuming this conduct actually did incite Gobert, " 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused' " unless the provocation was " 'such as would naturally tend to arouse the passion of the ordinarily reasonable man.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 950.) " ' "A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter." ' " (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1073.) Determining the killing was not voluntary manslaughter was not a close call.[8] The error in allowing hearsay evidence of prior domestic violence incidents was not prejudicial.

B.    Pitchess

Before trial, the Riverside County District Attorney's office notified defense counsel that one of the investigators on the case, Jennifer Higgins, was recently placed on administrative leave pending an internal

---

[8]    The jury began deliberating at 1:43 p.m. on July 28, 2021 and returned its verdict at about the same time the next day.

investigation "into potential moral turpitude conduct."[9]  Gobert filed a motion seeking *Pitchess* discovery of police records and asked the trial court to conduct an in camera review and disclose to counsel any discoverable information.  The trial court found good cause for an in camera hearing regarding "conduct involving moral turpitude."

The custodian of records for the Riverside Sheriff's department testified under oath during the in camera proceeding and identified four files he selected as potentially relevant.  One of the files was designated "[p]ersonnel," and the custodian of records stated it contained "evaluations and assignment type history."  The trial judge declined to examine its contents, stating, "I will not need to take a look at that."  The next file was designated "[m]edical."  Again, the trial judge declined to examine it.  The remaining two files were reviewed.  The trial judge found that one of them contained discoverable material on the issue of Higgins's "moral turpitude, dishonesty, fabrication."[10]  The court ordered the prosecutor to disclose the name and contact information of a witness identified in the document.

On appeal, Gobert asks that we independently review the sealed *Pitchess* materials and hearing transcript to determine whether the trial court erred in ordering only this disclosure.  The Attorney General does not oppose this request.

On our own motion in August 2022, we ordered the record augmented with the confidential documents reviewed by the trial court.  We also ordered the Riverside superior court clerk to transmit to this court "the items reviewed" by the trial judge.  If they were not available, we directed the trial

---

[9]  At one point in the case, Higgins was the primary investigator, interviewed witnesses, and participated in Gobert's interrogation.

[10]  Higgins did not testify at trial.

judge to hold a hearing within 30 days to settle the record by having the custodian of records for the Riverside County Sheriff's department provide the trial judge copies of the documents reviewed in camera. The trial judge was directed to "certify" that the items produced by the custodian of records "are the same documents reviewed on March 6, 2020." Finally, we ordered the Riverside superior court clerk to transmit under seal to this court only a copy of the settled record.

Upon comparing the sealed record provided by the Riverside superior court with the reporter's transcript of the trial judge's in camera review, we determined that two of the files produced by the custodian of records for the trial court's review were not transmitted to this court (the missing documents). We called this discrepancy to the attention of the superior court clerk and informally asked that the missing documents be transmitted to us under seal. When they still had not been produced by February 2023, we issued an order directing the superior court clerk to transmit the missing documents. We have now obtained and reviewed them.

*Pitchess, supra*, 11 Cal.3d 531 created a mechanism for criminal defendants to discover relevant evidence contained in confidential law enforcement personnel records. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1225−1226 (*Mooc*).) A defendant seeking discovery must file a motion supported by an affidavit showing good cause for the disclosure sought. (*Id.* at p. 1226.) "Good cause for discovery exists when the defendant shows both 'materiality' to the subject matter of the pending litigation and a 'reasonable belief' that the agency has the type of information sought." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1016.) This merely requires a plausible showing that officer misconduct might or could have occurred. (*Id.* at p. 1026; see *Sisson v. Superior Court* (2013) 216 Cal.App.4th 24,

34 (*Sisson*) [good cause threshold is relatively low].) If the defendant establishes good cause, the trial court is required to conduct an in camera hearing, where the custodian of records must bring to court all documents that are *potentially relevant* to the motion. (*Mooc,* at pp. 1226, 1228–1229.) At the in camera hearing, "the court must review the requested records in camera to determine what information, if any, should be disclosed" (*People v. Gaines* (2009) 46 Cal.4th 172, 179 (*Gaines*)), making a record of the documents it examined to facilitate appellate review (*Mooc*, at p. 1229). The court should thereafter disclose any responsive documents to the defendant. (*Gaines*, at p. 179; *Mooc*, at p. 1226.)

The decisionmaker is the court, not the custodian of records. (*Mooc, supra*, 26 Cal.4th at p. 1229.) Accordingly, "a trial court conducting an in camera review of peace officer personnel records must examine the produced records itself and may not rely on the custodian's assessment of the discoverability of the information contained in the records." (*Sisson, supra*, 216 Cal.App.4th at pp. 28–29.) Not only should it "examine all of the potentially responsive documents the custodian[ ] produce[s]," it must also "inquire into what types of documents the custodians opted *not* to produce," to adequately assess the completeness of the custodian's review and the legitimacy of his or her decision to withhold documents. (*Id.* at pp. 38–39, italics added.)

Here, although the custodian of records determined that four separate files were potentially relevant, the trial judge did not personally review two of them. Based solely on the custodian's descriptions of one as "[p]ersonnel" which "includes evaluations and assignments" and the other as "[m]edical," the court stated, "I will not need to take a look at that." This was a mistake because a general description like "evaluations" did not foreclose the

possibility that the file might contain information relevant to Higgins's honesty and credibility. As a general rule, a trial court "must examine the produced records itself and may not rely on the custodian's assessment of the discoverability of information contained in the records." (*Sisson, supra*, 216 Cal.App.4th at pp. 28–29.)

In the interest of judicial economy, we have independently reviewed all four files that the Sheriff's custodian of records testified he brought with him to the in camera hearing. (See *Mooc, supra*, 26 Cal.4th at p. 1232 [independently reviewing personnel file instead of remanding for further proceedings].) Based on that review, we are satisfied that the files contain nothing that bears on Higgins's credibility or honesty beyond what Gobert already received. Accordingly, the trial court's error was harmless because Gobert was not entitled to any additional discovery. (See, e.g., *Gains, supra*, 46 Cal.4th at p. 182 [prejudice must be shown even if *Pitchess* discovery was erroneously denied].)

C. *The Order Prohibiting Possession of Deadly Weapons and Paraphernalia Is Improper*

The minute order from the sentencing hearing states in part:

> "Do not knowingly own, possess or have under your control any firearm, deadly weapon, ammunition, or related paraphernalia, for life. . . . ."

Gobert maintains this was not part of the trial judge's oral pronouncement of the sentence. The Attorney General concedes the order should be stricken, and we agree. "In a criminal case, it is the *oral pronouncement of sentence* that constitutes the judgment." (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324.) In the event of a discrepancy between the oral pronouncement of judgment and a minute order or an abstract of judgment, the oral pronouncement controls. (*People v. Morales* (2014) 224 Cal.App.4th

15

1587, 1594; *People v. Zachery* (2007) 147 Cal.App.4th 380, 385.) At Gobert's sentencing hearing, the trial judge did not utter these words or anything even close to them. It follows that we must correct the discrepancy by ordering the trial court to modify the minute order. (See, e.g., *People v. Mitchell* (2001) 26 Cal.4th 181, 185 ["Courts may correct clerical errors at any time, and appellate courts . . . that have properly assumed jurisdiction of cases have ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts"].)

Moreover, trial courts generally do not enforce penal laws by injunction, unless specifically authorized to do so by statute. (See *Rincon Band of Luiseño Mission Indians etc. v. Flynt* (2021) 70 Cal.App.5th 1059, 1109.) If in the future Gobert should unlawfully possess a firearm, he can be charged and tried for that offense, but the court may not preemptively establish a lifetime injunction to enforce the criminal law. We will therefore strike the term: "Do not knowingly own, possess or have under your control any firearm, deadly weapon, ammunition, or related paraphernalia, for life" from the clerk's minute order of October 1, 2021.

Parenthetically, we have discovered numerous unpublished appellate opinions where defendants complained of the same error, and all of them originate from the Riverside County Superior Court.[11] In attempting to

---

[11]     *People v. Williams* (Oct. 22, 2021, E073445) [nonpub. opn.]; *People v. Fitzgerald* (Feb. 14, 2020, E071541) [nonpub. opn.]; *People v. Lillard* (June 12, 2018, D073720) [nonpub. opn.]; *People v. Granados* (Jan. 16, 2018, E065727) [nonpub. opn.]; *People v. Amaya* (Dec. 8, 2017, E066055) [nonpub. opn.]; *People v. Amaya* (Feb. 15, 2017, E065092) [nonpub. opn.]; *People v. Wilkerson* (July 16, 2015, E060059) [nonpub. opn.]; *People v. Shaver* (May 28, 2015, G049824) [nonpub. opn.]; *People v. Dunlap* (Mar. 13, 2015, E059899) [nonpub. opn.]; *People v. Suruy* (Nov. 6, 2014, E057934) [nonpub. opn.]; *People v. Flores* (Mar. 28, 2014, E057234) [nonpub. opn.]; *People v. Hutter*

understand why this is happening, we note that as supporting authority the minute order here cites Penal Code section "1202," which we assume is an attempt to cite Penal Code section 12021, the former statute prohibiting a felon from possessing a firearm.[12] As best we can determine, however, former Penal Code section 12021 never referred to "deadly weapons" or "paraphernalia," and in any event was repealed more than a *decade ago* (Stats. 2010, ch. 711, § 4 (2009–2010 Reg. Sess.) Sen. Bill No. 1080) and replaced by Penal Code section 29800, subdivision (a). That statute clearly applies only to firearms, and does not speak to other types of deadly weapons or to weapons-related "paraphernalia."[13]

D.    *The Minute Order's Instruction Regarding Firearms Is not Improper*

Under Penal Code section 29800, it is a crime for a person convicted of a felony to own, purchase, receive, possess, or have in their custody or control any firearm. Under Penal Code section 29810, subdivision (a)(2), the trial court is required to "instruct" such a person that they are "prohibited from owning, purchasing, receiving, possessing, or having under his . . . custody or control, any firearms, ammunition, and ammunition feeding devices . . . ."

Here, at sentencing the court did not give this instruction orally. But the clerk's minute order states:

---

(Jun. 11, 2013, E055202) [nonpub. opn.]; and *People v. Cronk* (May 4, 2010, E046546) [nonpub. opn.].

[12]    The minute order also cites a federal statute, section 922(g)(1) of title 18 of the United States Code, which makes it unlawful for a convicted felon to "possess . . . any firearm or ammunition."

[13]    Penal Code section 29800, subdivision (a)(1) provides: "Any person who has been convicted of a felony under the laws of . . . the State of California . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony."

"The court instructs the defendant that he or she is prohibited from owning, purchasing, receiving, possessing, or having under his or her custody or control any firearms, ammunition, and ammunition feeding devices, including, but not limited to magazines. Prohibited Persons Relinquishment forms were provided to defendant. . . . Defendant has completed a Prohibited Person Relinquishment Form."

On appeal, Gobert contends that because the court did not give this instruction orally, it must be stricken from the minute order as an unlawfully imposed sentence. We disagree. It is not an unauthorized criminal sentence because it is not a sentence at all—it is an *instruction*.

Moreover, a fair reading of the record is that Gobert received the requisite instruction. At sentencing the trial court remarked, "Oh, I do have the gun form. And so I'm also finding that Mr. Gobert has complied with the firearms relinquishment law. Nothing further is due at this time. No weapons are known."

The "gun form" is an apparent reference to a "Prohibited Persons Relinquishment Form," which the court is required to provide under Penal Code section 29810, subdivision (a)(2).[14] In the form, the first paragraph advises the convicted person: "Pursuant to Penal Code section 29810, any person who is convicted or any offense listed in [Penal Code] sections 29800 or 29805 is prohibited from owning, purchasing, receiving, possessing, or having under his or her custody or control any firearms, ammunition, and ammunition feeding devices, including but not limited to magazines." Because the record shows that Gobert completed this form, we can

---

[14]    On our own motion, we take judicial notice of the Prohibited Persons Relinquishment Form as revised January 2018 and readily available on the California Courts Judicial Branch Statutory Forms website. (§§ 452, subd. (c) [official acts], 454, subd. (a)(1), 459.)

confidently surmise he saw or should have seen the required instruction. In any event, given his 35 years to life prison sentence, any failure to so instruct at the time of sentencing would be harmless, since this opinion itself advises Gobert of the relevant information long before he should be in any position to need it.

## DISPOSITION

The judgment is affirmed. The provision in the clerk's minute order of October 1, 2021—"Do not knowingly own, possess, or have under your control any firearm, deadly weapon, ammunition, or related paraphernalia, for life"—is ordered stricken. The clerk of the superior court is ordered to prepare an amended minute order deleting that language.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.

19